## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALICE MAE WILLIAMS o/b/o J.H., | : | CIVIL NO.: 1:20-CV-00624 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| v. | : | |
| | : | |
| | : | |
| KILOLO KIJAKAZI,[1] | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. Introduction.

This is a social security action brought under 42 U.S.C. §§ 405(g) and

1383(c)(3).  Alice Williams ("Ms. Williams") seeks judicial review of the final

decision of the Commissioner of Social Security denying her minor son's claim for

supplemental security income benefits.  Because the Commissioner's decision is

---

[1] Kiolo Kijakazi is now the Commissioner of Social Security, and she is
automatically substituted as the defendant in this action. *See* Fed. R. Civ. P.
25(d) (providing that when a public officer sued in his or her official capacity
ceases to hold office while the action is pending, "[t]he officer's successor is
automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted
in accordance with this subsection shall survive notwithstanding any change in the
person occupying the office of Commissioner of Social Security or any vacancy in
such office.").

supported by substantial evidence, the court will affirm the Commissioner's decision.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 8-1* to 8-9.[2]  On November 8, 2016, Ms. Williams protectively applied[3] for supplemental security income benefits on behalf of her minor son J.H., alleging that J.H. has been disabled since August 22, 2016. *Admin. Tr.* at 10.  After the Commissioner denied the claim at the initial level of administrative review, Ms. Williams requested an administrative hearing. *Id.*  On October 26, 2018, J.H. and Ms. Williams, with the assistance of counsel, testified at a hearing before Administrative Law Judge ("ALJ") Patrick S. Cutter. *Id.* at 10-26.

After the hearing, J.H. underwent a consultative examination. *Id.* at 10  The report from this examination was received by the Social Security Administration and notice of the receipt was sent to Ms. Williams and her counsel on November

---

[2] The facts of the case are well known to the parties and will not be repeated here. Instead, we will recite only those facts that bear on Ms. Williams' claims.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id.*

21, 2018. *Id.*  After ten days of no response from Ms. Williams, the report was entered into evidence, and the record was closed. *Id.*

The ALJ determined that J.H. has not been disabled since November 8, 2016, the date of his application, and so he denied him benefits. *Id.* at 11.  Ms. Williams appealed the ALJ's decision to the Appeals Council, which denied her request for review on February 26, 2020. *Id.* at 1-4.  This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this court.

Ms. Williams filed this action on April 15, 2020. *Doc. 1.*  The Commissioner filed an answer to the complaint and a transcript of the proceedings that occurred before the Social Security Administration. *Docs.* 7-8.  The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 10.*  The parties then filed briefs, *see docs. 17, 20,* and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).  But the court's review of the Commissioner's factual findings is limited to whether

substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154.  Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether J.H. is disabled, but whether substantial evidence supports the Commissioner's finding that he is not disabled and whether the Commissioner correctly applied the relevant law.

**B. Initial Burdens of Proof, Persuasion, and Articulation.**

To receive supplemental security income pursuant to Title XVI of the Social Security Act, a claimant under the age of eighteen must demonstrate that he or she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also* 20 C.F.R. § 416.906. The ALJ follows a three-step sequential-evaluation process to determine whether a child claimant is disabled. *See* 20 C.F.R. § 416.924. Under this process, the ALJ must sequentially determine: (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has an impairment or combination of impairments that is severe; and (3) if so, whether the child's severe impairment (or combination of impairments) meets, medically equals, or functionally equals one of the disability listings. *Id*.

If the analysis proceeds to step three, the ALJ must determine whether a child's impairment meets, medically equals, or functionally equals a disability listing. *Id*. Whether a child's impairment functionally equals a disability listing is

analyzed in terms of six domains of functioning. 20 C.F.R. § 416.926a(b). "These domains are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical wellbeing. *Id.* When determining whether an impairment is functionally equivalent to a listing, the ALJ considers the effects of all the child's impairments, including those impairments that the ALJ does not identify as severe at step two of the analysis. 20 C.F.R. § 416.926a(a).

An impairment is functionally equivalent to a disability listing if it results in a "marked" limitation in two domains or an "extreme" limitation in one domain. *Id.* A "marked" limitation is one that seriously interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "'[m]arked" limitation also means a limitation that is "more than moderate" but "less than extreme."' *Id.* An "extreme" limitation is one that very seriously interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "'[e]xtreme" limitation also means a limitation that is "more than marked."' *Id.*

The ALJ uses a "whole child" approach in determining whether an impairment is functionally equivalent to a listing. *Title XVI: Determining*

*Childhood Disability Under the Functional Equivalence Rule-the "Whole Child"*
*Approach*, SSR 09-1P, 2009 WL 396031 (Feb. 17, 2009).  Under this approach, the
ALJ begins "by considering the child's functioning without considering the
domains or individual impairments." *Id*. at 1.  After identifying "which of a child's
activities are limited," the ALJ then determines "which domains are involved in
those activities," and "whether the child's impairment(s) could affect those
domains and account for the limitations." *Id*. at *2.  An impairment "may have
effects in more than one domain" and limitations caused by an impairment must be
evaluated "in any affected domain(s)." *Id*. (quoting 20 C.F.R. § 416.926a(c)).
Finally, the ALJ "rate[s] the severity of the limitations in each affected domain."
*Id*.  "This technique for determining functional equivalence accounts for all of the
effects of a child's impairments singly and in combination—the interactive and
cumulative effects of the impairments—because it starts with a consideration of
actual functioning in all settings." *Id*.

The ALJ's disability determination must also meet certain basic substantive
requirements.  Most significantly, the ALJ must provide "a clear and satisfactory
explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642
F.2d 700, 704 (3d Cir. 1981).  "The ALJ must indicate in his decision which
evidence he has rejected and which he is relying on as the basis for his finding."
*Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999).  The

"ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008).  Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Cotter*, 642 F.2d at 705).

## IV. The ALJ's Decision Denying J.H.'s Claim.

The ALJ evaluated J.H.'s claim at each step of the sequential-evaluation process. *Admin. Tr.* at 13-26.  At step one, the ALJ found that J.H. had not engaged in substantial gainful activity since his application date of November 8, 2016. *Id.*[4] Next, at step two, the ALJ found that J.H. had severe impairments of speech delay and developmental delay. *Id.*  Then, at step three, the ALJ determined that J.H. did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 in effect on the date of the ALJ issued his decision. *Id.*

As to this latter determination, addressing the six domains of functioning, the ALJ concluded that "the claimant does not have an impairment or combination of impairments that result in either 'marked' limitations in two domains of

---

[4] J.H. was born on June 25, 2014. *Admin Tr*. at 13.  The ALJ noted that J.H. was an older infant on November 8, 2016, the date of his application, and is currently a preschooler. *Id*.

functioning or 'extreme' limitation in one domain of functioning." *Id*. at 25.

Specifically, the ALJ found that J.H. had: (1) less than marked limitation in

acquiring and using information; (2) less than marked limitation in attending and

completing tasks; (3) less than marked limitation in interacting and relating with

others; (4) less than marked limitation in moving about and manipulating objects;

(5) less than marked limitation in the ability to care for himself; and (6) no

limitation in health and physical well-being. *Id*. at 18-25.  Based on this analysis,

the ALJ determined that J.H. "has not been disabled, as defined in the Social

Security Act, since November 8, 2016, the date the application was filed (20 CFR

416.924(a)).


## V. Discussion.

Ms. Williams contends that the ALJ erred and abused his discretion by failing

to properly consider J.H.'s limitations under the functional domains, particularly

regarding J.H.'s severe impairment of speech delay and developmental delay.

Specifically, Ms. Williams argues that J.H.'s impairments should have resulted in

marked limitations in the domains of acquiring and using information, attending

and completing tasks, and interacting and relating with others.  Additionally, Ms.

Williams contends that the ALJ erred and abused his discretion by failing to afford

appropriate weight to the consultative examiner's opinion and affording too much

weight to the State Agency consultants' opinions.  We conclude that the ALJ did

not err and that his decision is supported by substantial evidence.

### A. The ALJ's decision that J.H.'s impairments did not functionally equal a listing is based on substantial evidence.

Ms. Williams argues that the ALJ's finding that J.H. has no marked

limitations in the functional domains of acquiring and using information, attending

and completing tasks, and interacting and relating with others is not based on

substantial evidence.  Ms. Williams argues that the ALJ did not properly consider

J.H.'s impairments under the functional domains analysis, specifically, J.H.'s

speech delay and developmental delay.  But to the extent that Ms. Williams asks

this Court to re-weigh the record evidence or make new factual findings, this Court

may not invade the ALJ's province as finder of fact in disability proceedings, for

"our inquiry is not whether an alternate conclusion could have been reached but

whether substantial evidence supported the ALJ's decision."  *See Daub v. Colvin*,

No. 3:15–CV–1066, 2015 WL 8013037, at \*9 (M.D. Pa. Dec. 7, 2015).  For the

sake of completeness, therefore, we will explain why substantial evidence supports

the ALJ's finding that J.H. has a less than marked limitation in the functional

domain of acquiring and using information, attending and completing tasks, and

interacting and relating with others.

    **i.**     **Substantial evidence supports the ALJ's decision that J.H. has a less than marked limitation in the functional domain of acquiring and using information.**

The ALJ set forth the general standards that apply regarding the domain of acquiring and using information:

> This domain involves how well children perceive, think about, remember, and use information in all settings, which include daily activities at home, at school, and in the community (20 CFR 416.926a(g) and SSR 09-3p).
>
> Social Security rules provide that an older infant or toddler (i.e., a child age 1 to attainment of age 3) without an impairment should be learning about the world around him. When the child is playing, he should learn how objects go together in different ways. The child should learn that by pretending, his actions can represent real things. This helps the child understand that words represent things, and that words are simply symbols or names for toys, people, places, and activities. The child should refer to himself and things around him by pointing and eventually by naming. The child should form concepts and solve simple problems through purposeful experimentation (e.g., taking toys apart), imitation, constructive paly (e.g., building with blocks), and pretend play activities. The child should make simple choices between two things. The child should begin to respond to increasingly complex instructions and questions, and to produce increasing number of words and grammatically correct simple sentences and questions (20 CFR 416.926a(g)(2)(ii) and SSR 09-3p).
>
> Social Security rules provide that a preschooler (i.e., a child age 3 to attainment of age 6) without an impairment should begin to learn and use the skills that will help him to read and write and do arithmetic when he is older. For example, listening to stories, rhyming words, and matching letters are skills needed for learning to read. Counting, sorting shapes, and building with blocks are skills needed to learn math. Painting, coloring, copying shapes, and using scissors are some of the skills needed

in learning to write.  Using words to ask questions, give
answers, follow directions, describe things, explain what he
means, and tell stories allow the child to acquire and share
knowledge and experiences of the world around him.  The child
should be able to understand the order of daily routines (e.g.,
breakfast before lunch), understand and remember his own
accomplishments, and begin to understand increasingly
complex concepts such as time, as in yesterday, today, and
tomorrow.  All of these are called "readiness skills," and the
child should have them by the time he begins first grade (20
CFR 416.926a(g)(2)(iii) and SSR 09-3p).

Social Security regulation 20 CFR 416.926a(g)(3) and SSR 09-
3p set forth some examples of limited functioning in this
domain that children of different ages might have.  The
examples do not apply to a child of a particular age; rather, they
cover a range of ages and developmental periods.  In addition,
the examples do not necessarily describe "marked" or
"extreme" limitation in the domain.  Some examples of
difficulty children could have in acquiring and using
information are: (i) does not understand words about space,
size, or time (e.g., in/under, big/little, morning/night); (ii)
cannot rhyme words or the sounds in the words; (iii) has
difficulty recalling important things learned in school
yesterday; (iv) does not use language appropriate for age; (v) is
not developing "readiness skills" the same as peers (e.g.,
learning to count, reciting ABCs, scribbling); (vi) has difficulty
comprehending written or oral directions; (vii) struggles with
following simple instructions; (viii) has difficulty solving
mathematics questions or computing arithmetic answers; or (ix)
talks only in short, simple sentences, and has difficulty
explaining what he means.

*Id*. at 18-19.

After setting forth the above standards that apply to the domain of acquiring

and using information, the ALJ reasoned and concluded:

> <u>The claimant has less than marked limitation in acquiring and</u>
> <u>using information</u>.  In his function report, he was alleged to
> have difficulty understanding and learning (Exhibit 1E, p. 5).
> He could play with dolls or stuffed animals, use his own name,
> follow two-step directions, and point to parts of the body when
> asked but he could not listen at least five minutes to stories
> being read.  Memory reports were reported by his mother
> during hearing testimony.  Treatment notes from October 2016
> indicate the claimant had a language delay and he was still
> using just a few words (Exhibit 3F, p. 20).  Two months later, a
> child development evaluation found he was beginning to show
> understanding of objects when described by their use. (Exhibit
> 2F, p. 12).  He was not matching colors or sorting them on
> demand but could memorize lines from songs or TV shows.
> Slightly below average cognitive development was the overall
> assessment (*Id*. at 24).
>
> The claimant was beginning to name colors and could correctly
> orient a book but was not yet recalling familiar objects that had
> been removed from his sight in April 2017 (Exhibit 8F, p. 10).
> Standardized assessment results did not indicate a delay in
> cognitive development.  Overall, he was not demonstrating a
> need for specially designed instruction for cognitive issues at
> this time but would continue to be monitored due to his history
> of lead poisoning.  However, the claimant's classroom
> performance by February 2018 demonstrated a need to
> specialized instruction in participation and academic when in a
> classroom setting (Exhibit 11F, p. 10).  During his consultative
> examination in November 2018, it was difficult to assess his
> memory and cognitive functioning due to his age and
> diminished language skills but he demonstrated a capability to
> learn and retain (Exhibit 12F).  The doctors who reviewed the
> evidence of record for the State agency thought he had less than
> marked limitation in this functional domain (Exhibit 1A).  The
> undersigned finds this opinion consistent with the evidence of
> record and persuasive.

*Id*. at 19-20.

Here, the ALJ determined based on his review of the record that J.H. had a less than marked limitation in the functional domain of acquiring and using information. *Id.* The ALJ then explained the basis for his determination with specific references to record evidence.

Ms. Williams claims that the ALJ erred in his decision that J.H. had a less than marked limitation in the functional domain of acquiring and using information, however, she fails to specify as to how the ALJ erred in this regard. Thus, Ms. Williams' brief lacks specific argument on this issue and fails to show error. *See Hutcheson v. Berryhill*, 2017 U.S. Dist. LEXIS 132167, at *26 (M.D. Pa. Aug. 18, 2017) (finding that the Plaintiff needed to specify how the ALJ erred in a functional domain analysis).

The limitations that Ms. Williams mentions that seem related to the function domain of acquiring and using information are: (1) he can only identify four out of eight shapes; (2) he is not recognizing his name; (3) he cannot count accurately past five; (4) he has a need for specially designed instruction in cognitive development; (5) he has low scores on testing in attention and memory; (6) he has difficulty sorting objects by size; (7) he has trouble answering simple logic questions; and (8) he does not understand relative time. The ALJ properly addressed all of these limitations.

Regarding J.H.'s limitation in identifying four out of eight shapes, the ALJ discussed this by referencing an evaluation where J.H. showed improvement by correctly identifying certain shapes. *Admin. Tr.* at 20. Regarding J.H.'s inability to recognize his name, the ALJ addressed this by referencing a hearing test in which J.H. demonstrated a response to hearing his name whispered. *Id.* at 17. Additionally, the ALJ noted J.H.'s function report, which indicated he could use his own name. *Id.* at 19. While the ALJ did not directly address J.H.'s counting abilities, he referenced J.H.'s November 2018 consultative examination, which noted J.H.'s inability to count to ten, but still suggests that J.H. has demonstrated a capability to learn and retain. *Id.* at 20. Regarding J.H.'s potential need for specially designed instruction in cognitive development, the ALJ acknowledged that J.H. was slightly below average cognitive development, but his standardized assessment results did not indicate a delay in cognitive development. *Id.*

Regarding J.H.'s test scores in attention and memory, the ALJ addressed J.H.'s memory and cognitive functioning by referencing the November 2018 consultative examination, which proved inconclusive due to J.H.'s age and diminished language skills. *Id.* Additionally, the ALJ noted J.H.'s ability to memorize lines from songs and TV shows. *Id.* The ALJ addressed J.H.'s difficulty in sorting objects by size when he noted an evaluation where J.H. was capable of correctly sorting certain objects into a form board. *Id.* Regarding J.H.'s ability to

14

answer simple logic questions, the ALJ referenced J.H.'s function report, which indicated that J.H. was capable of pointing to parts of the body when asked. *Id*. at 19.  While the ALJ does not squarely address J.H.'s inability to understand relative time, he noted that J.H. was assessed with only slightly below average cognitive development for his age. *Id*. at 20.

In sum, the ALJ both considered and explained sufficient relevant evidence to persuade a reasonable mind that J.H. has a less than marked limitation in acquiring and using information.  *See Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (explaining the meaning of substantial evidence).  Thus, the ALJ's finding on this narrow question of degree is supported by substantial evidence and should not be disturbed.

ii.     **Substantial evidence supports the ALJ's decision that J.H. has a less than marked limitation in the functional domain of attending and completing tasks.**

The ALJ set forth the general standards that apply regarding the domain of attending and completing tasks:

> This domain considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the mental pace at which he performs activities and the ease of changing activities. Attending and completing tasks also refers to a child's ability to avoid impulsive thinking and his ability to prioritize tasks and manage his time. (20 C.F.R. 416.926a(h); SSR 09–4p).

Social Security rules provide that an older infant or toddler without an impairment should be able to attend to things that interest him (e.g., looking at picture books, listening to stories), and have adequate attention to complete some tasks (e.g., putting a toy away). As a toddler, he should demonstrate sustained attention, such as when building with blocks, and when helping to put on his clothes (20 CFR 416.926a(h)(2)(ii) and SSR 09-4p).

Social Security rules provide that a preschooler without an impairment should be able to pay attention when he is spoken to directly, sustain attention to his play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. The child should also be able to focus long enough to do many more things independently, such as gathering clothes and dressing, feeding, or putting away toys. The child should usually be able to wait his turn and to change his activity when a caregiver or teacher says it is time to do something else. The child should be able to play contentedly and independently without constant supervision (20 CFR 416.926a(h)(2)(iii) and SSR 09-4p).

Social Security regulation 20 CFR 416.926a(h)(3) and SSR 09-4p set forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty children could have in attending and completing tasks are: (i) is easily startled, distracted, or over-reactive to everyday sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest (e.g., games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; (v) requires extra supervision to remain engaged in an activity; or (vi) cannot plan, manage time, or organize self in order to complete assignments or chores.

*Admin. Tr.* at 20-21.

After setting forth the above standards that apply to the domain of attending

and completing tasks, the ALJ reasoned and concluded:

> <u>The claimant has less than marked limitation in attending and
> completing tasks.</u>  He could not listen at least five minutes to
> stories being read at the beginning of 2017 (Exhibit 1E, p. 5).
> Trouble sitting still and focusing were noted during the hearing.
> However, just a month earlier, he was able to occupy himself
> for at least five to ten minutes and attend to an activity for at
> least three minutes if self-directed and he was interested.
> (Exhibit 2F, p. 12).  In April 2017, the claimant was able to
> remain focused in order to complete a ten piece colored puzzle
> and remained seated at an evaluation table for close to thirty
> minutes (Exhibit 8F, p. 10).  Later that year, he was able to
> concentrate on a favorite YouTube video but not on other tasks
> such as playing with toys (Exhibit 12F).  While attention issues
> have been noted, the claimant is capable of focusing on things
> he is interested in doing.  Accordingly, less than a marked
> limitation attending and completing tasks is warranted.

*Id.* at 21.

Here, the ALJ determined based on his review of the record that J.H. had a

less than marked limitation in the function domain of attending and completing

tasks. *Id*.  The ALJ then explained the basis for his determination with specific

references to record evidence.

Ms. Williams argues that the ALJ only noted some of J.H.'s limitations but

that he failed to review the record as a whole, however, Ms. Williams fails to

specify what limitations the ALJ did not consider for the function domain of

attending and completing tasks.  The limitations that Ms. Williams mentions that seem related to the function domain of attending and completing tasks are: (1) he ignores tasks; (2) he has difficulty completing and learning tasks that have two steps or more; (3) he does not pay attention in class; (4) he gets distracted easily; and (5) he experiences staring spells.  The ALJ properly addressed these limitations.

Regarding J.H.'s tendency to ignore tasks, the ALJ discussed J.H.'s struggles with completing certain tasks, however, the ALJ also noted that J.H. was capable of completing certain tasks, particularly if he was interested. *Id*.  The ALJ also addressed J.H.'s difficulty in completing and learning tasks that have two or more steps by referencing J.H.'s ability to complete a ten-piece colored puzzle. *Id*. Regarding J.H.'s distracted behavior in the classroom, the ALJ noted that distracted behavior was demonstrated in early 2018 and that J.H. required redirection, however, the ALJ also referenced J.H.'s ability to concentrate on tasks he is interested in, such as watching his favorite YouTube video. *Id*.  Regarding J.H.'s staring spells, the ALJ noted that J.H. engages in staring spells; however, he failed to directly refer to the limitation when he decided that J.H. had a less than marked limitation in the function.  Even so, the ALJ thoroughly addressed J.H.'s concentration limitations with numerous references to J.H.'s ability to concentrate when interested. *Id*.

Additionally, the ALJ found that J.H. had a less than marked limitation in the function domain of attending and completing tasks, unlike the State Agency consultants, who found that J.H. had no limitation in this domain. *Id*. at 110. Accordingly, the ALJ both considered and explained sufficient relevant evidence to persuade a reasonable mind that J.H. has a less than marked limitation in attending and completing tasks. *See Pierce*, 487 U.S. at 565. Thus, the ALJ's finding on this narrow question of degree is supported by substantial evidence and should not be disturbed.

### iii.    Substantial evidence supports the ALJ's decision that J.H. has a less than marked limitation in the functional domain of interacting and relating with others.

The ALJ set forth the general standards that apply regarding the domain of attending and completing tasks:

> This domain considers how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. Interacting and relating with others relates to all aspects of social interaction at home, at school, and in the community. Because communication is essential to both interacting and relating, this domain considers the speech and language skills children need to speak intelligibly and to understand and use the language of their community (20 CFR 416.926a(i) and SSR 09-5p).

> Social Security rules provide that an older infant or toddler without an impairment is dependent upon caregivers, but should begin to separate from them. The child should be able to express emotions and respond to the feelings of others. The

child should begin initiating and maintaining interactions with adults, but also show interest in, then play alongside, and eventually interact with other children of the same age. The child should begin to understand the concept of "mine" and "his" or "hers." The child should be able to spontaneously communicate his wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know he can understand the child most of the time (20 CFR 416.926a(i)(2)(ii) and SSR 09-5p).

Social Security rules provide that a preschooler without an impairment should be able to socialize with children as well as adults. The child should begin to prefer playmates and start developing friendships with children who are his own age. The child should be able to use words instead of actions to express himself, and also be better able to share, show affection, and offer to help. The child should be able to understand and obey simple rules most of the time, and sometimes asks permission. The child should be able to relate to caregivers with increasing independence, choose his own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. The child should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what he says most of the time (20 CFR 416.926a(i)(2)(iii) and SSR 09-5p).

Social Security regulation 20 CFR 516.92a(i)(3) and SSR 09-5p set forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and development periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty that children could have in interacting and relating with others are: (i) does not reach out to be picked up and held by caregiver; (ii) has no close friends, or all friends are older or younger than the child; (iii) avoids or withdraws from people he knows, or is overly anxious or fearful of meeting new people or trying new experiences; (iv) has difficulty playing games or sports with

rules; (v) has difficulty communicating with others (e.g., in using verbal and nonverbal skills to express himself, in carrying on a conversation or in asking others for assistance); or (vi) has difficulty speaking intelligibly or without adequate fluency.

*Admin. Tr.* at 21-22.

After setting forth the above standards that apply to the domain of interacting and relating with others, the ALJ reasoned and concluded:

> The claimant has less than marked limitation in interacting and relating with others.  His mother reported he had a very small vocabulary and struggled to talk (Exhibit 1E, p. 4).  Testimony indicated he goes to speech therapy twice a week and fights with other children his age.  Treatment notes from October 2016, when he was two years old, indicate the claimant had a language delay and he was still using just a few words (Exhibit 3F, p. 20).  Therapy had not been started yet.  He was using over ten words and beginning to communicate in a back and forth style two months later (Exhibit 2F, p. 14).  However, he was not using words to relate information about other people.  At the same time, the claimant seemed to enjoy playing with others and showed both affection and sympathy towards other children. (*Id*. at 16).  Speech and language services were recommended.  Less than marked limitation interacting and relating with other was opined by the State agency doctors (Exhibit 1A).
>
> The claimant had delayed speech sound production, trouble understanding language such as questions and directions, had slightly weak reception vocabulary skills, and demonstrated articulation errors in April 2017 (Exhibit 8F, p. 11).  Appropriate affection could be shown towards people and he would play with others but he could also be mean or prefer to play by himself (*Id*. at 12).  The claimant was still speaking in short word utterances in February 2018 (Exhibit 11F, p. 11).

Articulation errors were present, which made it very difficult for him to communicate with others and his overall speech intelligibility was judged to be ten to fifteen percent. Trouble understanding what he said was still occurring in late 2018 and language delay continued to be noted (Exhibit 12F). The claimant was able to testify in an understandable manner at his hearing for a very brief period but he did not always address the question asked of him. While speech delay has been a persistent issue for him, considering he still has not reached the age of five years old and is able to play with others, a marked limitation interaction and relating with others is not present.

*Id*. at 22.

Here, the ALJ determined based on his review of the record that J.H. had a less than marked limitation in the function domain of attending and completing tasks. *Id*. The ALJ then explained the basis for his determination with specific references to record evidence.

Ms. Williams argues that the ALJ failed to address J.H.'s limitations, however, she fails to specify what limitations the ALJ did not consider for the function domain of interacting and relating with others. The limitations that Ms. Williams mentions that seem related to the function domain of interacting and relating with others are: (1) he has a hard time playing with others and difficulty interacting with peers; (2) he makes noise for the sake of making noise; (3) he has issues with communication development, social and emotional development; (4) he has frequent meltdowns at home and school; and (5) he was limited in his ability to

communicate when addressing the ALJ.  The ALJ properly addressed these limitations.

Regarding J.H.'s difficulty in playing with others, the ALJ noted that J.H.'s April 2017 evaluation indicated that he could play with other children, but that he sometimes is mean or prefers to play alone. *Id.*  Additionally, the ALJ referenced a 2016 childhood development evaluation which indicated J.H. showed both affection and sympathy towards other children. *Id.*  Regarding J.H.'s tendency to make noise, the ALJ considered that J.H. demonstrated articulation errors. *Id.*

Regarding J.H.'s social development issues, the ALJ addressed this by noting J.H.'s speech improvement over time. *Id.*  Notably, the ALJ referenced J.H.'s speech therapy and that he was using over ten words and beginning to communicate in a back-and-forth style during an evaluation. *Id.*

The ALJ did not directly reference J.H.'s meltdowns at home and school, however, he noted the need for specialized instruction for participation and academics in a classroom setting. *Id.* at 20.  Also, the ALJ made numerous references to J.H.'s ability to behave and follow instructions when he is sufficiently interested in the task. *Id.* at 21.

Additionally, Ms. Williams contends that the ALJ did not consider J.H.'s hearing loss, absence types seizures, and ADHD/anxiety.  The ALJ properly addressed these issues.  Regarding J. H.'s hearing loss, the ALJ noted that J.H.

23

failed a January 2017 hearing test at school, but that it was unknown whether J.H. failed due to true hearing loss or a lack of effort. *Id*. at 17.  Further, the ALJ referenced a later hearing test where J.H.'s ear drums functioned normally, as J.H. responded to hearing his name whispered. *Id*.

The ALJ noted the November 2018 consultative exam where J.H. was diagnosed with provisional ADHD. *Id*. at 13.  The ALJ cited to the other medical records in evidence that do not reference J.H.'s ADHD, and therefore, found it failed to cause more than a minimal functional limitation. *Id*. at 14.  The ALJ referred to J.H.'s November 2018 evaluation where anxiety was noted. *Id*. at 18. While the ALJ did not thoroughly address J.H.'s potential anxiety issues, we note that Dr. John Tardibuono ("Dr. Tardibuono"), the consultative examination physician, did not diagnose J.H. with anxiety after his consultative examination. *Id*. at 873.

Regarding J.H.'s absence type seizures, as previously mentioned, the ALJ noted J.H.'s staring spells, however, he failed to consider the purported seizures that resulted from J.H.'s staring spells. *Id*. at 17.  We conclude that the ALJ erred in failing to mention the seizures that purportedly resulted from J.H.'s staring spells.  Accordingly, we must determine whether the ALJ's error was harmless. "'[W]hether the error is harmless depends on whether the other reasons cited by the ALJ . . . provide substantial evidence for [his] decision.'" *Snyder v. Colvin*, No.

24

4:16-CV-00261, 2017 WL 1732031, at *6 (M.D. Pa. May 3, 2017) (report and recommendation of a magistrate judge), adopted, 2017 WL 2798320, at *1 (M.D. Pa. June 28, 2017).  Here, the record confirms that J.H. underwent a sleep EEG for seizures due to staring spells and the results were negative for seizures. *Admin. Tr.* at 266.

Additionally, regarding J.H.'s staring spells, the ALJ thoroughly addressed J.H.'s concentration limitations with numerous references to J.H.'s ability to concentrate when interested. *Id*.  Thus, the ALJ's error in failing to adequately address J.H.'s staring spells and absence type seizures was a harmless error.

### B. The weight assigned by the ALJ to the medical opinions is based on substantial evidence.

Ms. Williams argues that the ALJ erred in affording appropriate weight to the opinion of the consultative examination physician, Dr. Tardibouno.  Additionally, Ms. Williams contends that the ALJ afforded too much weight to the State Agency consultants' opinions without proper explanation by the ALJ.  Ms. Williams also argues that the ALJ indicated he would use a medical expert, but failed to do so, resulting in insufficient opinions of record at the time of the hearing.  We find that the weight assigned by the ALJ to the medical opinions is based on substantial evidence.

Because Ms. Williams' claims concern the ALJ's handling of opinion evidence, we start with a brief overview of the regulations regarding opinion evidence. The regulations applicable to claims filed on or after March 27, 2017, ("the new regulations") changed the way the Commissioner considers medical opinion evidence and eliminated the provision in the regulations applicable to claims filed before March 27, 2017, ("the old regulations") that granted special deference to opinions of treating physicians. Because Ms. Williams' claim was filed before March 27, 2017, the old regulations apply in this matter.

Under the old regulations, the ALJ assigns the weight he or she gives to a medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). And if "a treating source's medical opinions on the issue(s) of the nature and severity of [a claimant's] impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Commissioner "will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Under the old regulations, where the Commissioner does not give a treating source's medical opinion controlling weight, it analyzes the opinion in accordance with a number of factors: the "[l]ength of the treatment relationship and the frequency of examination," the "[n]ature and extent of the treatment relationship," the "[s]upportability" of the opinion, the "[c]onsistency" of the opinion with the record

26

as whole, the "[s]pecialization" of the treating source, and any other relevant factors. *Id*. at §§ 404.1527(c)(2)–(c)(6), 416.927(c)(2)–(c)(6).

Ms. Williams contends that the ALJ failed to afford appropriate weight to Dr. Tardibouno's opinion. Specifically, Ms. Williams argues that Dr. Tardibouno's opinion should have been afforded more weight because he was the only physician who examined J.H. in person. Ms. Williams argues that the other medical opinions noted in the ALJ's decision were from non-treating and non-examining State Agency consultants.

Although Dr. Tardibouno did conduct an in-person evaluation of J.H., he is not a treating source. Dr. Tardibouno did not have a treatment relationship with J.H. Instead, Dr. Tardibouno conducted a one-time examination of J.H. A physician who conducts a one-time examination is not a treating source, and thus, his opinion is not entitled to controlling weight. *See Thomas v. Kijakazi*, 2021 U.S. Dist. LEXIS 131691, at *12 (W.D. Pa. 2021) (finding that a one-time consultative examiner is not a treating source, and therefore, his opinion is not entitled to controlling weight).

As such, the ALJ was entitled to reject any portion of Dr. Tardibouno's opinion, so long as he provided adequate justification. *See Corona v. Comm'r of Soc. Sec*., 2014 U.S. Dist. LEXIS 132131, at *5 (W.D. Pa. 2014) (finding that the ALJ was at liberty to reject a one-time examiner's opinion, as long as he provided

27

a legitimate reason for doing so). The ALJ provided adequate justification for why he afforded limited weight to Dr. Tardibouno's opinion. The ALJ noted that Dr. Tardibouno was only able to examine and interview J.H. one time. *Admin*. *Tr.* at 18. The ALJ also noted that Dr. Tardibouno did not review any of J.H.'s medical records or child development evaluation reports. *Id*. Additionally, the ALJ opined that Dr. Tardibouno seemed to rely heavily on Ms. Williams' allegations regarding J.H. rather than objective findings. *Id*.

An ALJ may give an opinion less weight or no weight if it does not present relevant evidence, if it does contain a sufficient explanation to support it, or if it is inconsistent with the record as a whole. 20 C.F.R. § 416.927(c). The ALJ may choose which medical evidence to credit and which to reject as long as there is a rational basis for the decision. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). Here, the ALJ provided adequate justification as to why he afforded limited weight to Dr. Tardibouno's opinion. Accordingly, we find that the ALJ's decision to afford limited weight to Dr. Tardibouno's opinion is based on substantial evidence.

Ms. Williams also argues that the ALJ afforded too much weight to the State Agency consultants' opinions without proper explanation by the ALJ. We find that the ALJ properly explained his allocation of significant weight to the opinions of the State Agency consultants.

28

The ALJ noted that the State Agency consultants, Dr. Roger Fretz and Dr. Anjana Popat, reviewed the record and found that J.H. suffers from severe autism spectrum disorder. *Admin. Tr.* at 18.  The State Agency consultants found that J.H.'s severe autism spectrum disorder caused a less than marked limitation in acquiring and using information and interacting and relating with others. *Id*. Additionally, they found that J.H.'s severe autism spectrum disorder caused no limitation in attending and completing tasks. *Id.*  The ALJ explained that he gave the State Agency consultants' opinions significant weight because both doctors are familiar with the regulations and standards of the Social Security Act. *Id.*  Further, the ALJ concluded that the State Agency consultants' opinions were consistent with J.H.'s medical records and academic evaluations, which document development speech delay but minimal treatment. *Id.*  Contrary to Ms. Williams' argument, the ALJ provided an explanation as to why he afforded significant weight to the State Agency consultants' opinions.

Ms. Williams also argues that the State Agency consultants finding that J.H. suffers from severe autism spectrum disorder conflicts with their function domains analysis.  The Commissioner correctly points out that a severe impairment at step two does not necessitate marked or extreme limitations at later steps of the sequential process.  Step three of the sequential process determines whether the

29

child's severe impairment (or combination of impairments) meets, medically equals, or functionally equals one of the disability listings. *See* 20 C.F.R. § 416.924.  Here, the ALJ relied on the State Agency consultants' opinions that J.H.'s severe autism spectrum disorder did not meet, medically equal, or functionally equal one of the disability listings. *Admin*. *Tr*. at 18.  Because a finding for a severe impairment at step two does not necessitate marked or extreme limitations at later steps of the sequential process, the State Agency consultants' finding of less than marked limitations is not inherently inconsistent.

The ALJ provided a rational basis as to why he afforded significant weight to the State Agency consultants' opinions.  Accordingly, we conclude that the ALJ's decision to afford significant weight to the State Agency consultants' opinions is based on substantial evidence.

Ms. Williams alleges that the ALJ indicated he would be using a medical expert, and that the ALJ's failure to do so resulted in insufficient opinions of record at the time of the hearing.  The Commissioner properly points out that it was Plaintiff's counsel who requested the medical expert examination, and upon that request, the ALJ would proffer a medical expert consultative examination. *Admin*. *Tr*. at 100.  The ALJ noted that he offered the consultative examination to Ms. Williams, however, no response was received. *Id*. at 10.  The record is clear that the ALJ offered the consultative examination to Ms. Williams, however, no

request was made, and thus, the examination did not occur.  Accordingly, we find no error on the part of the ALJ in this matter.

In sum, the ALJ chose between contrasting medical opinions, giving greater weight to those opinions which he found were more congruent with J.H.'s medical records and activities of daily living.  It is the right and responsibility of the ALJ to make such assessments, and we find that substantial evidence supported the ALJ's decision.  "We will not set the Commissioner's decision aside if it is supported by substantial evidence, even if we would have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360.  Ms. Williams' argument simply asks the court to reweigh the evidence, which we cannot do. *See Messina v. Comm'r of Soc. Sec.*, No. 20-1884, 2021 WL 422444, at *3 (3d Cir. Feb. 8, 2021) ("Yet we cannot reweigh the evidence or make our own factual determinations."); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (stating that the court may not weigh the evidence or substitute our conclusions for those of the ALJ).  Because we are not permitted to reweigh the evidence, we conclude that the ALJ did not err in his consideration of the opinion evidence of record.

## VI.  Conclusion.

For the foregoing reasons, the decision of the Commissioner will be affirmed, and final judgment will be entered in favor of the Commissioner and against Ms. Williams.  An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge